**Warren G. COUSIN, Plaintiff-Appellee, Cross-Appellant,**

v.

**BOARD OF TRUSTEES OF HOUSTON MUNICIPAL SEPARATE SCHOOL DISTRICT, et al., Defendants-Appellants, Cross-Appellees.**

No. 83–4089.

United States Court of Appeals, Fifth Circuit.

March 9, 1984.

Rehearing and Rehearing En Banc

Denied May 3, 1984.

---

James S. Gore, Armis E. Hawkins, Houston, Miss., for Board of Trustees of Houston Municipal School Dist.

Kenneth Mayfield, Tupelo, Miss., for Warren G. Cousin.

Before CLARK, Chief Judge, GARZA and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge.

Fourteen years and six federal court appearances after the Houston Municipal Separate School District (HMSSD) voluntarily desegregated its schools in 1970, it finds itself yet again in federal court. In this proceeding, the school district appeals a decision by the district court granting Warren G. Cousin, former principal of the black high school in Chickasaw County, Mississippi, injunctive relief and back pay pursuant to this court's decision in *Singleton v. Jackson Municipal Separate School District,* 419 F.2d 1211 (5th Cir.1969) (en banc), *cert. denied,* 396 U.S. 1032, 90 S.Ct. 612, 24 L.Ed.2d 530 (1970), (*Singleton III*). Finding no violation of Cousin's *Singleton* rights, we reverse the decision of the district court.

## I.

Understanding the sequence of events forming the factual background to Cousin's suit is crucial to understanding our holding

in this case. Prior to 1969, two separate school districts operated in Chickasaw County, Mississippi. The Houston Municipal Separate School District (HMSSD) operated an all-white high school in the town of Houston. The Chickasaw County School District operated an all-black high school, also located in the town of Houston.

In early 1969, HMSSD entered into negotiations with the Chickasaw County Board of Education to acquire Chickasaw County High School, toward the end of establishing a unitary, racially integrated school system. The two school boards reached an agreement in early August of 1969 to transfer the county school to HMSSD. In September, the transfer became final when the state committee on educational finance approved the acquisition. Prior to this approval, HMSSD had no legal power to begin consolidation and integration of the two high schools.

Knowing that the fall semester already would be in progress by the time the state committee approved the transfer, the school boards drafted the transfer agreement to provide for Chickasaw County High School and Houston High School to be operated during the 1969–70 school year as they previously had been operated. Consequently, the HMSSD board informed the faculty members of Chickasaw County High School that it would honor Chickasaw County's annual contracts with them. It also informed them that before making further commitments to them it would evaluate their employment contracts during the 1969–70 year.

During that year Warren Cousin was principal of Chickasaw County High School. The accreditation standards of the Southern Association of Schools and Colleges, to which HMSSD adhered in 1969, required that all high school principals hold at least a master's degree in educational administration. Cousin did not hold a master's degree. Thus, during 1969, the HMSSD told him that he could not remain in the HMSSD as a high school principal. Additionally, the

HMSSD decided to operate only one, racially integrated, high school after the 1969–70 school year, and to convert Chickasaw County High School to a racially integrated middle school. Because of this consolidation, beginning in the 1970–71 school year, HMSSD needed only one high school principal. When the HMSSD board met on February 2, 1970, to select administrators for the upcoming school year, however, it voted to offer Cousin a position as assistant principal of the high school. Cousin accepted the position.

On February 6, 1970, four days after the school board meeting, black parents in and around the town of Houston filed a class action lawsuit in federal district court, seeking to have the HMSSD placed under a desegregation injunction. Cousin was a plaintiff in that action. Over HMSSD's strenuous protests that beginning in late August of 1970 it would be operating a unitary school district voluntarily, in early August of 1970, the district court granted the injunction. It deemed an injunction appropriate because the school system was not unitary at the time the action was filed. The injunction was of the type generally issued in school cases throughout this circuit, conforming to the language set forth in *Singleton III.*

By the time the injunction issued in August, Cousin already had begun serving in his capacity as assistant principal of the high school pursuant to the decision the school board made in February.

On appeal this court affirmed the district court's granting of the injunction, but remanded the case to the district court to determine whether the HMSSD was operating as a unitary school district, and, if so, directing it to terminate the case. *See Taylor v. Houston Municipal Separate School District,* 444 F.2d 118 (5th Cir.1971). The district court, on remand, heard arguments on the unitary status issue from the original plaintiffs in the *Taylor* case, including Cousin.[1] On December 17, 1971, having declaring the HMSSD to be unitary. *See Cousin*

---

1. The plaintiffs specifically raised the issue of Cousin's displacement as an objection to de-

termined the HMSSD had achieved unitary status, the district court entered an order terminating the desegregation injunction.[2] The HMSSD, then, remained under injunction only approximately sixteen months, from August of 1970 until December of 1971. Cousin's demotion from principal to assistant principal occurred in February of 1970, before the injunction was issued; indeed, four days before the filing of any lawsuit.

## II.

One of the standard provisions contained in school injunctions in this circuit, including the injunction issued against the HMSSD, gave staff members and teachers displaced or demoted because of the desegregation order preferential treatment or recall rights.[3] These rights, called *Singleton* rights, have been the subject of multitudinous litigation in this circuit. One such *Singleton* lawsuit is that of Warren G. Cousin, first filed in May of 1977. Cousin alleged that the HMSSD board demoted him in 1970 at the time of desegregation and, though he was qualified,[4] passed him over for subsequent principalships several times. He alleged violations of his constitutional rights and statutory civil rights se-

---

v. *Board of Trustees*, 488 F.Supp. 75, 79 (N.D. Miss.1980) (*Cousin I*).

2. The district court, in an oral opinion rendered from the bench, determined that the defendant school district was operating presently as a unitary system. It said specifically:

    (i) That the school system currently operated by defendant School District is a unitary system of schools;

    (ii) That defendants' Motion to Dismiss shall be and the same hereby is sustained;

    (iii) That this action shall be and the same hereby is finally dismissed and terminated on the docket of this Court; and

    (iv) That defendants shall be and they hereby are taxed with the cost of this action, to be assessed by the Clerk of the Court in due course.

The district court emphasized that it was deciding only the issue of unitary status, and that the proceeding was "not a hearing to determine whether these teachers are entitled to back pay, or whether they received due process."

3. The typical injunction provided:

    If there is to be a reduction in the number of principals, teachers, teacher-aides, or other professional staff employed by the school district which will result in a dismissal or demotion of any such staff members, the staff member to be dismissed or demoted must be selected on the basis of objective and reasonable non-discriminatory standards from among all the staff of the school district. In addition if there is any such dismissal or demotion, no staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted, until each displaced staff member who is qualified has had an opportunity to fill the vacancy and has failed to accept an offer to do so.

    Prior to such a reduction, the school board will develop or require the development of nonracial objective criteria to be used in se-

lecting the staff member who is to be dismissed or demoted. These criteria shall be available for public inspection and shall be retained by the school district. The school district also shall record and preserve the evaluation of staff members under the criteria. Such evaluation shall be made available upon request to the dismissed or demoted employee.

    "Demotion" as used above includes any re-assignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. In general and depending upon the subject matter involved, five years is such a reasonable period.

*Singleton III*, 419 F.2d at 1218.

4. Defining "qualification," this court in its opinion on appeal from the district court said:

    [U]nder the settled law of this Circuit, displaced faculty members who otherwise meet *Singleton III* standards need only be "minimally qualified" in order to acquire *Singleton III* recall rights. That is, where *Singleton III* is called for, a person of another race may not be chosen because he/she is more qualified than the *Singleton III* protectee.

*Cousin v. Board of Trustees of Houston Municipal Separate School District*, 648 F.2d 293, 298 n. 4 (5th Cir.1981).

*See also Moore v. Tangipahoa Parish School Board*, 594 F.2d 489, 496 (5th Cir.1979); *United States v. Jefferson County Board of Education*, 380 F.2d 385, 394 (5th Cir.1967) (en banc), *aff'g with modifications*, 372 F.2d 836 (5th Cir.), *cert. denied sub nom.*, *Caddo Parish School Board v. United States*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

cured by Title VII of the Civil Rights Act of 1964, as well as violation of his *Singleton* rights. He invoked federal jurisdiction under 42 U.S.C. §§ 1981, 1983, and 2000e.

The district court found HMSSD was not motivated racially when it abolished one of the principalships during consolidation, and thus ruled against Cousin on his constitutional and statutory civil rights claims. The district court also found that a six-year statute of limitations barred Cousin from raising any *Singleton* claims that may have arisen prior to May 1971, and that no *Singleton* rights existed with respect to claims arising after the school system was found to be unitary in December of 1971. *Cousin v. Board of Trustees,* 488 F.Supp. 75 (N.D. Miss.1980) (*Cousin I*). *See also Cousin v. Board of Trustees,* 648 F.2d 293 (5th Cir. 1981) (*Cousin II*).

On appeal this court reversed the district court, holding that Cousin became qualified to serve as a high school principal in 1973 when he received his master's degree, and that *Singleton* rights accrued to him for vacancies occurring after that time. *See Cousin II,* 648 F.2d at 298. Disposing of the appeal on the basis of the *Singleton* issue, the court did not address Cousin's statutory claims. *Id.* at 295. On petition for rehearing, however, this court deemed its early decision improper because it precluded the HMSSD from presenting contrary arguments and evidence on the *Singleton* issues. We vacated the previous decision and remanded the case to the district court for full factual findings on the *Singleton* issues alone, again without addressing the other claims. *Cousin v. Board of Trustees,* 661 F.2d 377 (5th Cir.1981).

Finally, in May of 1983, Cousin obtained the relief he desired when, on remand, the district court issued a memorandum opinion finding that the HMSSD violated Cousin's *Singleton* rights in 1975 when a principalship vacancy occurred after 1973, the year Cousin obtained his master's degree, and the board failed to offer him the position. The district court ordered back pay at a principal's rate from the time of the vacancy, pursuant to *Lee v. Macon County Board of Education,* 453 F.2d 1104 (5th Cir.1971). It also ordered the HMSSD to offer Cousin the first principalship vacancy occurring either at the high school or the middle school. In July of 1983 such a vacancy occurred. The district court declined to stay the injunction, and Cousin now is serving as principal of the middle school in Houston.

The HMSSD appeals this last decision of the district court, raising several issues. Cousin cross-appeals, requesting back pay from 1970 as relief for violation of his *Singleton* rights. Cousin does not pursue his statutory or constitutional claims. Consequently, the only issue before us is whether HMSSD violated Cousin's *Singleton* rights. We reverse the decision of the district court because we find that Cousin's *Singleton* rights were not violated.

### III.

In its *Singleton III* decision, this court sought to cope with the consequences of its order that segregated school systems be dismantled immediately. We realized at the time of the decision that unifying school systems often would cause elimination of duplicative jobs. In an effort to mitigate the logistical problems the court-ordered desegregation created, and to ensure that black teachers and staff members did not feel a disproportionate impact from the reductions, in *Singleton III* we issued a detailed and specific order addressing many potential problems. We intended the order to serve as a model for district courts to use in future cases as well as to apply to the parties directly involved in *Singleton III. Moore v. Tangipahoa Parish School Board,* 594 F.2d 489, 498 (5th Cir.1979). *See also Lee v. Russell County Board of Education,* 563 F.2d 1159, 1161 (5th Cir.1977); *United States v. Texas Education Agency,* 459 F.2d 600, 601 (5th Cir.1972).

A major provision of the *Singleton III* order concerned displaced personnel. The provision required that demotions and dismissals caused by desegregation orders be consistent with previously promulgated objective criteria. The provision also created preferences, or recall rights, in favor of

those teachers and staff members who inevitably would be displaced because of the court order.[5]  *See Wright v. Houston Independent School District,* 569 F.2d 1383 (5th Cir.1978); *Lee v. Chambers County Board of Education,* 533 F.2d 132, 135 (5th Cir. 1976); *Pickens v. Okolona Municipal Separate School District,* 527 F.2d 358, 361 (5th Cir.1976).  This model order is the foundation of so-called "*Singleton* rights."

■ As generally articulated in opinions by this court, *Singleton* applies to any case "where a desegregation-related reduction of school staff members has been shown." *Pegues v. Morehouse Parish School Board,* 706 F.2d 735, 739 (5th Cir.1983).  *See also Fort Bend Independent School District v. City of Stafford,* 651 F.2d 1133 (5th Cir.1981); *Barnes v. Jones County School District,* 544 F.2d 804 (5th Cir.1977).  Although *Singleton III* does not explicitly limit its applicability to *court-ordered desegregation,* it does so implicitly by directing district courts to "make them a part of the orders to be entered." *Singleton III,* 419 F.2d at 1217.  Some of our subsequent cases explicitly do limit applicability of *Singleton III* to court-ordered desegregation contexts.  *See, e.g., Hardy v. Porter,* 546 F.2d 1165, 1168 (5th Cir.1977); *Thompson v. Madison County Board of Education,* 496 F.2d 682, 684 (5th Cir.1974); *McLaurin v. Columbia Municipal Separate School District,* 478 F.2d 348, 349 (5th Cir.1973).  *Cf. Campbell v. Gadsen County District School Board,* 534 F.2d 650, 652 (5th Cir.1976) (implicitly limiting *Singleton* to court-ordered desegregation situation).  Other cases, however, refer to *Singleton* rights as though they were legal rights independent of the desegregation order, having their origin in the Equal Protection Clause of the fourteenth amendment.  *See, Lee v. Russell City Board of Education,* 563 F.2d 1159, 1161 and 1163 (5th Cir.1977) (*Singleton* rights referred to as "standards" and "law"); *Adams v. Rankin County Board of Education,* 485 F.2d 324, 327 n. 2 (5th Cir.1973) (*Singleton* "established a principle of law.").  *See also McCurdy v. Board of Public Instruction of*

*Palm Beach County,* 509 F.2d 540 (5th Cir. 1975) (*Singleton* applied to situation in which plaintiff alleged violation of his fourteenth amendment rights); *Lee v. Macon County Board of Education,* 453 F.2d 1104, 1112 (*Singleton* embodies a core of substantive rights that, unlike its procedural aspects, may attach retroactively.).  *But see Hardy v. Porter,* 546 F.2d 1165, 1168 (5th Cir.1977) ("*Singleton* entitlements are not constitutional rights.").

In short, now, almost fifteen years after we decided *Singleton III,* the nature of the protections it affords displaced teachers and staff members remains unclear.  The confusion may stem in part from the fact that the same events may give rise to *Singleton* claims as well as to statutory civil rights claims and fourteenth amendment equal protection claims.  *See Barnes v. Jones County School District,* 544 F.2d 804, 807 (5th Cir.1977); *McCormick v. Attala County Board of Education,* 541 F.2d 1094, 1095 (5th Cir.1976); *Baker v. Columbus Municipal Separate School District,* 462 F.2d 112, 115 (5th Cir.1972).

■ This court never has faced squarely the question whether *Singleton* rights may attach absent court-ordered desegregation, or, as is the case with Warren Cousin, may attach when the displacement or demotion occurred prior to a *Singleton III*-type injunction.  Warren Cousin's suit requires us to examine this issue, as well as the issue whether *Singleton* rights continue after the injunction has been dissolved.  We start from the premise that *Singleton* rights are equitable in nature.  *Pegues v. Morehouse Parish School Board,* 632 F.2d 1279, 1281 (5th Cir.1980); *Hardy v. Porter,* 546 F.2d 1165, 1168 (5th Cir.1977).  From this premise, we conclude that they cannot exist except as a part of the equitable remedy imposed in a *Singleton III*-type desegregation injunction.

Despite the fact that some of our cases refer to *Singleton* rights as "law" or as being "constitutional," the inescapable fact is that an overwhelming number of cases

---

**5.** *See supra* note 3.

apply *Singleton III* principles in court-ordered desegregation situations.[6] If *Singleton* rights are "law," then, they are law only in the sense that any injunction creates a law of the case, just as binding on the parties to the injunction as if it were statutory or constitutional. Although a meritorious *Singleton* claim also may be meritorious under the civil rights statutes or the fourteenth amendment, *Singleton III* does not create or embody separate substantive rights existing apart from the judicial orders that create the displacement damage *Singleton* attempted to mitigate.

In the many cases decided in this circuit concerning the termination of *Singleton* rights, we find support for our holding that *Singleton* rights arise only in the context of court-ordered desegregation. At some point after a court orders a school district to desegregate, judicial supervision of the school system becomes unnecessary. *See, e.g., Davis v. East Baton Rouge Parish School Board,* 721 F.2d 1425 (5th Cir.1983). *Cf. Green v. County School Board,* 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968) (court must retain jurisdiction until unitary status achieved). At that point, when the school district achieves "unitary status," aggrieved teachers and staff no longer may invoke *Singleton III, e.g., McCormick v. Attala County Board of Education,* 407 F.Supp. 586 (E.D.Miss.1976), and principles of contract law and constitutional

or statutory imperatives govern the case. *McLaurin v. Columbia Municipal Separate School District,* 478 F.2d 348 (5th Cir.1973); *Thompson v. Madison County Board of Education,* 476 F.2d 676 (5th Cir.1973). Indeed, as this court has noted, after the district achieves unitary status, "implementation of *Singleton* remedies would create more hardships than it would alleviate" and revive racial antagonisms without even a finding of discrimination. *Pegues v. Morehouse Parish School Board,* 632 F.2d 1279, 1282 (5th Cir.1980).

If *Singleton* rights were legal rights, and not limited remedial devices appurtenant to an injunction, they hardly could dissipate as they do upon the termination of the injunction. They exist to remedy the inevitable inequities caused by the injunction. They cease to exist when the court terminates the injunction.

## IV.

■ Against this legal background, we examine Cousin's claims. Cousin argues that HMSSD violated his *Singleton* rights when, after displacing him in the process of creating a unitary school district, it failed to offer him comparable employment as a high school or middle school principal when positions became available. Under the facts of this case, however, we hold that Cousin's *Singleton* rights were not violated.

Though Cousin's displacement occurred as a result of desegregation, the desegregation

**6.** In the few cases in this circuit applying *Singleton* in the absence of court-ordered desegregation, the court did not face the issue of the appropriateness of applicability. For example, *Fort Bend Independent School District v. City of Stafford,* 651 F.2d 1133, 1135 (5th Cir.1981) clearly applied *Singleton* to a voluntary desegregation context. Because of the unusual posture in which the parties invoked *Singleton III,* that case, however, does not stand for the proposition that *Singleton* rights always should attach in voluntary desegregation situations. Rather than involving a plaintiff trying to enforce *Singleton* rights against a defendant school board, in *Fort Bend* the school district itself argued that it had not achieved "unitary status," a *Singleton* concept, to obtain an injunction preventing the city from establishing its own separate school district. The parties in *Fort Bend* evidently chose *Singleton* standards as their point of reference, and the issue wheth-

er *Singleton* rights attached to any of the personnel in the school district was not before the court.

Similarly, the opinion in *Bassett v. Atlanta Independent School District,* 485 F.2d 1268 (5th Cir.1973), leaves unclear whether the court was applying *Singleton* concepts in the absence of a court order. The opinion stated only that desegregation occurred in the face of "Government pressure." *Id.* at 1269. The precise issue before the court in *Bassett* was whether *Singleton* rights could apply to displacements that occurred before *Singleton* became effective, not whether *Singleton* applied absent a desegregation order. The court said that *Singleton* criteria are not applicable to displacements occurring before February 1, 1970, the effective date of the *Singleton* order. It held, however, that the plaintiff's *Singleton* rights were violated because the displacement actually occurred after the effective date of *Singleton.*

was voluntary. The HMSSD was not under an order to desegregate until several months after the displacement. Additionally, although desegregation obviously precipitated the displacement, the board did not offer Cousin a position as principal because he did not then hold a master's degree as required by the Southern Association of Schools and Colleges.[7] Even when a *Singleton* injunction is in effect, a school board may fail to hire or promote if it does so according to publicized "nonracial objective criteria."[8] Thus, we have two alternative reasons for holding that the school board did not violate Cousin's *Singleton* rights by failing to offer him a position when the board initially consolidated the school districts. First, his displacement did not result from a court order so that *Singleton* rights attached at the outset. Second, even if *Singleton* rights had attached, until sometime after the court terminated the injunction, he lacked the objective, publicized qualification of holding a master's degree.

Any *Singleton* claims that may have arisen because of subsequent vacancies fail for the same two alternative reasons. The HMSSD was under a judicial desegregation order for only approximately sixteen months, from August of 1970 through mid-December of 1971. During that time at least one principal's position became available. The school board failed to offer the position to Cousin. The board, by this failure, however, did not violate Cousin's *Singleton* rights. His initial displacement still was not the result of the court order, and he still was unqualified according to the valid objective requirement that high school principals hold a master's degree.

Cousin obtained his master's degree in 1973, two years after the district court de-clared the HMSSD had achieved unitary status and dissolved the injunction. As explained previously in this opinion, once a school district achieves unitary status and the court lifts the injunction, its personnel no longer may invoke the protections of *Singleton III*. Thus, Cousin's *Singleton* rights could not have been violated after he became qualified to serve as principal. The district court in this case erred when it held that the HMSSD violated Cousin's *Singleton* rights by failing to offer him any of the principal's positions that became available between 1973 and the time he filed this lawsuit in 1977 for the reason that the court terminated the desegregation injunction in 1971.

Cousin relies on our decision in *Moore v. Tangipahoa Parish School Board*, 594 F.2d 489 (5th Cir.1979) to support his argument that he should be afforded the same rights granted to those displaced by *Singleton* injunctions. Unfortunately for Cousin's case, *Moore* is distinguishable—essentially on the basis we have been discussing. In *Moore*, the school district had been under a desegregation injunction for several years prior to this court's decision in *Singleton III*. *Id.* at 491. Then, in September of 1970, the district court imposed the specific terms of *Singleton III* on the school district. In 1969, a few months before imposition of the specific *Singleton* injunction, a teacher, Duplessis, displaced because of a court order, filed a motion to hold the school board in civil contempt for violation of her *Singleton* rights, alleging that the school board had discharged her before promulgating nonracial objective criteria.[9] The district court at first denied the motion, but on remand and under instruction to "grant such relief as appropriate," awarded *Singleton*-type relief to Duplessis. *Id.* at 497–98. Because

---

**7.** In an amendment to its first opinion, the district court held that Cousin became qualified after obtaining his master's degree in 1973, and that the school board violated his *Singleton* rights by failing to offer him positions that became vacant after he became qualified. Thus, the district court implicitly found, as a matter of fact, that the master's degree requirement was a valid "nonracial objective criteria" under *Singleton III*. *See supra* note 3. Cousin argues before this court that the district court's

implicit finding is clearly erroneous. In light of the grounds of our disposition of this case, we need not reach that issue.

**8.** *See supra* notes 3 & 7.

**9.** Duplessis' claim was one of many brought before the court in a class action seeking to hold the school district in contempt. *Moore*, 594 F.2d at 491.

Duplessis' claim was filed as a motion to hold the board in contempt, she properly obtained equitable relief—*Singleton* or otherwise—from the court that imposed the desegregation order displacing her. Her relief was a part of the district court's continuing supervision over desegregation, and despite rather broad language in the opinion, the relief was, in essence, an amendment to the order displacing Duplessis, applying *Singleton* retroactively to her.

The court's action in *Moore* was wholly within its equitable powers, and because the specific provisions of *Singleton* were meant to apply to all school desegregation orders, wholly justifiable in a case in which a court order had caused the displacement. Crucial to the attachment of *Singleton* rights to Duplessis was the court order that caused displacement and continued through the time her rights were violated. Neither of these elements is present in Cousin's case. *Moore,* contrary to Cousin's position, does not stand for the broad proposition that if the school district ever has been under a desegregation injunction, *Singleton* rights attach to anyone displaced at any time during the desegregation process.[10]

*Singleton* rights address the specific problem of displacement caused by court orders. The causal link is crucial. Without an underlying court order causing the displacement, we have no basis upon which to impose *Singleton* equitable remedies.

Cousin's demotion occurred several months before the filing of the suit that resulted in the *Singleton*-type injunction. Further, he did not become qualified to serve as a principal until after the court lifted the injunction. Thus, the causal link that would warrant affording Cousin *Singleton III* protections is missing. Consequently, Cousin's *Singleton* rights were not violated. *Singleton* rights are part and parcel of judicial desegregation orders. They do not protect those who lack valid requisite

qualifications, and do not attach in situations in which displacement or job opportunity occurs in the absence of a court's injunction order.

### V.

We hold that the district court erred. Cousin, and others similarly situated, are left to pursue remedies provided them by the constitution and by statutes that create substantive rights in favor of those who feel they have been treated wrongfully because of their race. The decision of the district court is

REVERSED.

---

10. Though at first glance *Moore* seems to contradict the holding of *Bassett v. Atlanta Independent School District,* 485 F.2d 1268 (5th Cir.1973), discussed in footnote 6, the two cases are distinguishable. In *Moore* the school district was under a desegregation injunction prior to the date *Singleton III* became effective.

Thus, the court held that when the injunction is in place, the specific terms of *Singleton III* may relate back to those displaced by the injunction. In *Bassett* the court only set forth the general proposition that *Singleton III* does not apply retroactively.